## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, and its LOCAL 13-857, | ) ) ) ) ) ) | Case No. 14-CV-086-JHP-PJC |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| PHILLIPS 66 COMPANY, a foreign corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

## OPINION AND ORDER

Before the Court are Defendant's Motion for Summary Judgment [Doc. No. 20] and Plaintiffs' Motion for Summary Judgment [Doc. No. 21]. After consideration of the briefs, and for the reasons stated below, Plaintiffs' Motion is **GRANTED** and Defendant's Motion is **DENIED**.

## BACKGROUND

Plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union and its Local 13-857 (collectively, the "Union") and Defendant Phillips 66 Company ("Phillips 66" or the "Company") are parties to a collective bargaining agreement ("CBA") effective March 31, 2012, to March 31, 2015, covering various bargaining unit employees at the Company's Ponca City, Oklahoma refinery. [Doc. No. 21-2, (Decl. of Jason Smith), at ¶ 3]. The CBA was initially entered into between the Union and the Company's predecessor company, ConocoPhillips. [*Id.* at ¶ 4]. When ConocoPhillips spun

off certain assets, including the Ponca City refinery, into Phillips 66, Phillips 66 agreed to assume ConocoPhillips' obligations under the CBA.  [*Id.*].

Article 15 of the CBA covers health insurance benefits for bargaining unit employees. [Doc. No. 20-1, Ex. A-1 (CBA), at 12-13].  Article 15 provides certain benefit plans named in the CBA, including the Employee Medical and Dental Plans, "shall be continued for the period of this Agreement subject to the rules and regulations of the plans and this contract."  [*Id.* at 12]. Article 15 further provides eligible bargaining unit employees

> will participate in the Employee Medical and Employee Dental Plans generally available to the employees of the Company as of the date of this Agreement as well as subsequent modifications to these Plans that might occur during the term of this Agreement that also apply generally to the employees of the Company.

[*Id.* at 13].  Under Article 15, the Company "agrees to pay 80% of the premiums for the Employee Medical and Dental Plan" as well as "80% of any premium increases that occur during the term of this Agreement."  [*Id.*].

Article 30 of the CBA defines "grievance" as "a dispute or conflict between the Company and the Union as to the interpretation or application of the terms of this Agreement."  [*Id.* at 54]. Article 30 contains a four-step procedure for settling grievances.  [*Id.* at 54-57].  The first step, Step A, must be initiated within 10 business days "of the date the incident arose."  [*Id.* at 54, 57]. The grievance procedure culminates in arbitration when a dispute is not resolved at the earlier stages of the procedure.  [*Id.* at 56].  "Only differences arising between the Union and the Company relating to interpretation or performance [of the CBA] which . . . have gone through the grievance procedure are arbitrable."  [*Id.* at 57].

The CBA also incorporates a 1997 letter of understanding governing successorship (the "Successorship Letter").  The Successorship Letter provides, in relevant part, that following any "sale, merger, or joint venture" involving the Ponca City refinery, the successor company may

establish a new package of employee benefits for bargaining unit employees, but must, upon request, "negotiate with the Union in good faith regarding those benefits." [*Id.* at 69]. Should an agreement not be reached regarding those benefits, the successor company may proceed with implementation of the proposed benefit plans, and the Union will not have the right to strike. [*Id.*].

**The Current Dispute**

On July 13, 2012, the Company informed the Union via letter that it would be changing medical plan benefits for current employees and retirees effective January 1, 2013. [Doc. No. 20-1 (Decl. of Andrew Sona), at ¶ 5; *id.* at Ex. A-2]. Pursuant to Step A of the CBA grievance procedure, on September 8, 2012, the Union requested to bargain over the announced changes. [*Id.* at Ex. A-3]. In October 2012, the Company refused the Union's request, citing Article 15 of the CBA and the Successorship Letter. [*Id.* at Ex. A-4]. On November 12, 2012, the Union filed written grievances in accordance with Step B of the CBA grievance procedure, protesting the announced health care changes for both current employees and retirees. [*Id.* at Ex. A-5]. The Union cited Articles 1, 3, and 15 of the CBA, as well as the Successorship Letter. [*Id.*]. On November 28, 2012, the Company denied the grievances, labeled (1) R12-5 – Changes to Employee Medical Plan and (2) R12-6 – Changes to Retiree Medical Plan (together, the "Grievances"). [*Id.* at Ex. A-6]. On December 4, 2012, the Union advanced the Grievances to Step C of the grievance handling procedure. [*Id.* at Ex. A-7]. On January 30, 2013, the Company issued a "Step C" response, again refusing to bargain over Grievances R12-5 and R12-6. [*Id.* at Ex. A-8].

On February 19, 2013, the Union advanced both grievances to Step D, the final step of the grievance procedure, by requesting arbitration. [*Id.* at Ex. A-9]. On October 2, 2013, the

Company informed the Union it would not arbitrate the Grievances, on the ground they were not arbitrable.  [*Id.* at Ex. A-11].  Regarding Grievance R12-5, the Company stated it had no duty to arbitrate because the CBA "delegated to the Company" authority to modify benefit plans, and thus "[t]he Company clearly did not agree to arbitrate disputes arising from such modifications." [*Id.*].  The Company further stated that, because of the Union's past practice of not seeking to arbitrate the Company's changes to the benefit plans, "the Union has waived its right, to the extent it ever had such right, to arbitrate the Company's right to make such changes, or the changes themselves." [*Id.*].  The Company also denied the Successorship Letter applied to either Grievance, because the Company's spin-off from ConocoPhillips was not a "sale, merger, or joint venture." [*Id.*].  Regarding Grievance R12-6, the Company stated, "there is no agreement to arbitrate any dispute over changes to [retiree health] benefits because there is no duty to bargain over such benefits in the first place and, therefore, nothing to arbitrate." [*Id.*].

The Union filed a Complaint in this Court on February 24, 2014, seeking an order to compel arbitration of Grievances R12-5 and R12-6 pursuant to 29 U.S.C. § 185.  [Doc. No. 2]. Both parties moved for summary judgment on November 7, 2014.  [Doc. Nos. 20, 21].  The motions are fully briefed and ready for review by this Court.

## DISCUSSION

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the

4

suit under the governing law." *Id.*  In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

## I.    Procedural Arbitrability of the Grievances

The Court will first address the issue of "procedural arbitrability" raised in the Company's Motion for Summary Judgment.  The Company argues the Grievances are not arbitrable because the Union failed to timely initiate the grievance procedure.  The CBA grievance procedure provides the Step A grievance meeting shall be scheduled to take place within 10 business days of the "date the incident arose."  [Doc. No. 20-1, Ex. A-1, at 54, 57]. The CBA further provides only differences that "have gone through the grievance procedure are arbitrable."  [*Id.* at 57].  The Company sent its letter announcing changes to the medical plans on July 13, 2012, which, according to the Company, required a Step A request from the Union no later than July 27, 2012.  Because the Union sent its Step A request on September 8, 2012, the Company asserts the Grievances have not "gone through the grievance procedure" under the CBA and are therefore not arbitrable.  The Union counters that (1) the Company waived this timeliness argument by processing the Grievances through Steps B and C and (2) the "date the incident arose" in Step A arguably refers to the date the Company's changes took effect, January 1, 2013, rather than the date the Company informed the Union of the proposed changes.

Disputes over "whether the unexcused failure to follow [grievance procedure] avoids the duty to arbitrate" are questions of procedural arbitrability, but such disputes "cannot ordinarily be answered without consideration of the merits of the dispute which is presented for

arbitration." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964).   Because the court is prohibited from evaluating the merits of the grievance when arbitrability is at issue, questions of whether the parties complied with the agreement's procedural rules are generally decided by the arbitrator, not the court. *Gen. Warehouseman and Helpers Union Local 767 v. Albertson's Distribution, Inc.*, 331 F.3d 485, 487-88 (5th Cir. 2003). "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley*, 376 U.S. at 557; *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("So, too, the presumption is that the arbitrator should decide allegation[s] of waiver, delay, or a like defense to arbitrability.") (citation and quotation marks omitted).  While the Company is correct that in rare instances, a court may decide an issue of procedural arbitrability that would bar arbitration altogether, a court may decide such an issue only "when no rational mind could question that the parties intended for a procedural provision to preclude arbitration and that the breach of the procedural requirement was clear." *Albertson's*, 331 F.3d at 488 (citation omitted); *see John Wiley*, 376 U.S. at 557 (noting that procedural issues should operate to bar arbitration only in "rare" cases).

Here, the parties disagree whether the Company effectively waived its timeliness objection by processing the Grievances through Steps B and C without asserting any such objection.  The record before the Court indicates the Company first raised the untimeliness issue in detail in its Motion for Summary Judgment, filed on November 7, 2014.  The parties also dispute whether the "date the incident arose" was intended to mean the date the Company notified the Union of the benefit plan changes (July 13, 2012) or the date the changes took effect (January 1, 2013).  Because a rational mind could conclude the Company waived its untimeliness

argument and/or the Union complied with the CBA's procedural arbitrability rules, the Court cannot preclude arbitration on procedural grounds. *See Denhardt v. Trailways, Inc.*, 767 F.2d 687, 690 (10th Cir. 1985) (concluding procedural dispute as to compliance with contractual time limits was an arbitrator question when substance was arbitrable). Accordingly, arbitrability of the Grievances rests on their substantive, not procedural arbitrability.

## II.      Substantive Arbitrability of the Grievances

The Court next turns to the "substantive arbitrability" of Grievances R12-5 and R12-6. It is the court's duty to determine questions of substantive arbitrability, because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("*Warrior & Gulf*"); *see Denhardt*, 767 F.2d at 690 ("The courts decide this question [of substantive arbitrability] because no one must arbitrate a dispute unless he has so consented."). However, "[i]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("*AT&T*"); *Commc'n Workers of Am., AFL-CIO v. US West Direct*, 847 F.2d 1475, 1479 (10th Cir. 1988) ("the Supreme Court's directive could not have been clearer—it is not for the court to rule on the potential merits even if the case appears frivolous.").

### A.      Grievances R12-5 and R12-6 Fall Within the CBA's Broad Definition of "Grievance" and Are Not Expressly Excluded From Arbitration

When a collective bargaining agreement contains an arbitration clause, there is a presumption in favor of arbitrability. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in

favor of coverage." *Warrior & Gulf*, 363 U.S. at 582-83; *Commc'n Workers of Am. v. Avaya, Inc*., 693 F.3d 1295, 1300 (10th Cir. 2012).  Once the presumption in favor of arbitrability is triggered, it is difficult to overcome.  Unless there is an express provision in the collective bargaining agreement excluding a particular dispute from arbitration, the dispute must be ordered to arbitration unless there exists "the most forceful evidence of a purpose to exclude the claim from arbitration." *Warrior & Gulf*, 363 U.S. at 584-85.

The presumption is "particularly applicable" where, as here, the arbitration clause is broad. *AT&T*, 475 U.S. at 650.  A broad clause "refer[s] all disputes arising out of a contract to arbitration." *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) (citation and quotation marks omitted).  Here, the CBA refers any dispute or conflict to arbitration when it concerns the interpretation or application of the terms of the CBA and has gone through the grievance procedure.  [Doc. No. 20-1, Ex. A-1, at 54, 57].  The Tenth Circuit has previously held that this same arbitration language in this CBA was "broad" and thus subject to the "most forceful evidence" requirement to exclude the claim from arbitration.  *See Local 5-857 Paper, Allied-Industrial, Chemical and Energy Workers Int'l Union v. Conoco Inc.*, 320 F.3d 1123, 1124 n.1, 1126 (10th Cir. 2003).

In this case, the presumption applies to Grievances R12-5 and R12-6, because they clearly fall within the CBA's broad definition of a "grievance"—"a dispute or conflict between the Company and the Union as to the interpretation or application of the terms of this Agreement"—and are not expressly excluded from arbitration.  [Doc. No. 20-1, Ex. A-1, at 54]. The Union alleges the Company violated Articles 1, 3, and 15 of the CBA, as well as the Successorship Letter.[1]  [*Id.* at ex. A-5].  Specifically, the Union first alleges the Company

---

[1] Article 1 "recognizes the Union as the sole and exclusive representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment as certified by the National

8

violated Article 1 by changing "rates of pay, wages . . . and other conditions of employment" without engaging in the requested collective bargaining with the Union.  [Doc. No. 21, at 9]. Second, the Union alleges the Company violated Article 15 by implementing health care benefits that do not comply with Article 15.  [*Id.*].  Third, the Union alleges the Company violated the Successorship Letter, incorporated through Article 3, by implementing new health care benefits that are not "reasonably comparable in the aggregate" to the previous benefits and rejecting the Union's request to negotiate over the announced changes prior to implementation.  [*Id.*].  Each of these claims is a "dispute or conflict between the Company and the Union as to the interpretation or applicability of the terms of [the CBA]" that is subject to the CBA's grievance and arbitration procedure.

Moreover, none of the alleged violations is expressly exempted from arbitration under the CBA.  The only rights that are expressly excluded from arbitration are those that originate under Article 11 of the CBA, Management's Rights, and health care benefits do not fall among the rights enumerated in Article 11.  [Doc. No. 20-1, Ex. A-1, at 10-11]; s*ee Oil, Chemical and Atomic Workers Int'l Union Local 5-391, et al. v Conoco, Inc.*, 64 F. App'x 178, 181 (10th Cir. 2001) (CBA with identical grievance language was "subject to the grievance and arbitration process in [its] entirety, except for grievances 'originating' under the Management's Rights Clause.").  Accordingly, the presumption in favor of arbitration is triggered.

**B.      The Company Fails to Present the "Most Forceful Evidence" of the Parties' Intent to Exclude the Grievances from Arbitration**

Because Grievances R12-5 and R12-6 fit within the CBA's broad definition of a "grievance" and are not expressly exempted from arbitration, the burden falls on the Company to

---

Labor Relations Board in Case No. 16-RC-6182."  Article 3 provides the CBA is the "entire Agreement" between the Union and the Company, including "all Agreements subsequently entered into by the parties during the term" of the CBA "when reduced to writing and signed by authorized representatives of the Company and the Union."

present "most forceful evidence" of the parties' intent to exclude these disputes from arbitration. *Warrior & Gulf*, 363 U.S. at 584-85.  The Company has failed to meet this burden.

### 1.    The Extent of the Company's Discretion Under the CBA to Modify Health Care Benefits Falls Within the Arbitration Clause

First, the Company argues its decision to modify the health care benefits without bargaining is not subject to arbitration because the decision to modify such benefit plans "has been delegated to the Company under the CBA."  [Doc. No. 20-1, Ex. A-12].  The Company relies on language in Article 15, which states:

> Eligible employees covered by the [CBA] will participate in the Employee Medical and Employee Dental Plans generally available to the employees of the Company as of the date of [the CBA] as well as *subsequent modifications to these Plans that might occur* during the term of [the CBA] that also apply generally to employees of the Company.

[Doc. No. 21, Ex. A-1, at 13 (emphasis added)].  The Company asserts the phrase "subsequent modifications to these Plans that might occur" gives it unfettered discretion to change employee health care plans without bargaining.  However, Article 15 does not expressly state that the Company has such unilateral power.  At best, the cited phrase is ambiguous with respect to the Company's authority.   This phrase could just as easily be read to mean "subsequent modifications" made after good faith negotiations between the Company and the Union. Accordingly, this language in Article 15 does not present "the most forceful evidence" of an intent to exclude from arbitration disputes related to medical plan changes.  This is precisely the type of ambiguity in the CBA that the parties agreed to resolve via arbitration.

Moreover, other language in Article 15 indicates the Company does not have unfettered authority to modify the benefit plans.  Article 15 requires the Company "to pay 80% of the premiums for the Employee Medical and Dental Plan" and "80% of any premium increases that occur during the term of" the CBA.  [Doc. No. 20-1, Ex. A-1, at 13].  Thus, even if the Company

has some discretion to change the health care plan, it cannot do so in a manner that results in employees paying more than 20% of premiums or more than 20% of any increase in premiums. Grievance R12-5 appears to directly raise this issue, as the Union states "[i]t appears that the [new] plan increases for the employee exceed the medical inflation rate and therefore exceed the 20% employee portion." [Doc. No. 20-1, Ex. A-5]. The Company asserts Article 15's percentage requirement is a "red herring" [Doc. No. 23, at 9], yet this language plainly imposes a limitation on the Company's allegedly unfettered authority to modify the health care plan. This grievance clearly presents a dispute "as to the interpretation or application of the terms of" the CBA, which requires arbitration.

The Court is also not persuaded that the Medical and Dental Assistance Plan document (the "Plan document"), rather than the CBA, governs disputes related to Plan amendments. The Plan document grants the Plan's Administrator sole authority "to interpret the Plan," "to determine all questions of participation, benefit eligibility and benefit amounts," and "to review and resolve any disputes or claims which may arise under the Plan." [Doc. No. 23-1, Ex. 1, at 2]. The Plan Administrator "shall have absolute discretion in carrying out his responsibilities," and his interpretations and resolutions are "binding, final and conclusive on all parties." [*Id.* at 2-3]. The Plan document further indicates that the "Company, acting through its Board of Directors" has authorized a delegate to "terminate, suspend, amend, or modify the Plan . . . in whole or in part at any time." [*Id.* at 5]. The Company argues that these provisions demonstrate the parties' intent to exclude questions concerning Plan amendments from arbitration pursuant to the CBA.

The Company correctly points out that other circuits have held a dispute is not arbitrable when it concerns a challenge to the proper administration of the benefits plan itself, rather than a violation of a right under the collective bargaining agreement. *See, e.g., United Steelworkers of*

11

*Am., AFL-CIO-CLC v. Commonwealth Aluminum Corp.*, 162 F.3d 447, 451 (6th Cir. 1998) (benefit claims review procedure that was incorporated into the collective bargaining agreement showed the parties' intent to exclude benefit determinations from arbitration); *Int'l Ass'n of Machinists and Aerospace Workers, Dist. No. 10 v. Waukesha Engine Div.*, 17 F.3d 196, 198-99 (7th Cir. 1994) (incorporated benefits plan that provided for an alternative review procedure indicated the parties did not intend to arbitrate disputes concerning the denial of benefits); *Oil, Chemical & Atomic Workers Union v. Amoco Chemical Corp.*, 589 F.2d 162, 164 (5th Cir. 1979) (same).

In contrast to the above cases, however, this case does not involve challenges to interpretation or administration of the Plan.  Rather, the Union alleges the Company's *amendments* to the health care plan violated its obligations *under the CBA*.  Notwithstanding the powers granted to the Plan Administrator and the Company in the Plan document, the Company has not offered any evidence showing that either the Plan Administrator or the Company may determine whether the Plan was lawfully amended in accordance with the CBA.  Indeed, the Plan document does not account at all for the restrictions in Article 15 of the CBA, which states the Medical and Dental Plans "shall be continued for the period of this Agreement" and requires the Company to pay 80% of the premiums and 80% of any premium increases for the Medical and Dental Plan.  [Doc. No. 20-1, Ex. A-1, at 12].  The Company fails to explain how the Company delegate's authority to amend or terminate the Plan may be limited in any way by Article 15.  Accordingly, the Plan document does not preclude arbitration of the issue of whether changing the terms of the benefit plan violates Article 15 of the CBA.  *See Waukesha Engine*, 17 F.3d at 198 n.1 (discussing earlier decision, where court found changes to the *terms* of the company retirement plan violated clause in the parties' collective bargaining agreement that "the

existing Retirement Plan as amended by this agreement will be maintained during the term of this agreement").

### 2. The Existence and Effect of Past Practices Is a Question for the Arbitrator

Second, the Company argues "past practice" prohibits bargaining over future changes to the health care plan.  This question, however, is also the type of question an arbitrator should decide.  *Local No. 7 United Food and Commercial Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223, 1228 (10th Cir. 2000) ("the very nature of the arbitrator's role in settling disputes under a collective bargaining agreement is to examine such practices" as past practice).  Thus, whether the Union "waived its right" to arbitrate the Company's ability to make unilateral changes to the plans, or the changes themselves, is an arbitrator question.  *See Reid Burton Constr., Inc. v. Carpenters Dist. Council of Southern Colorado*, 535 F.2d 598, 603 (10th Cir. 1976) (noting that broadly-worded arbitration clauses require arbitration of equitable defenses, such as waiver, arising out of the processing of a grievance under a collective bargaining agreement).

### 3. The Interpretation of the Successorship Letter Is a Question for the Arbitrator

Third, the Company argues the Successorship Letter does not require arbitration of the Grievances because the spin-off of the Company from ConocoPhillips was not a "sale, merger, or joint venture" as those terms are used in the Successorship Letter.  [Doc. No. 20-1, Ex. A-12]. However, what exactly the parties meant by "sale, merger, or joint venture" is itself "a dispute or conflict . . . as to the interpretation or application of [the CBA]," and thus a question that should be submitted to the arbitrator.  *See Carpenters Dist. Council of Denver and Vicinity v. Brady Corp.*, 513 F.2d 1, 2-4 (10th Cir. 1975) (holding dispute over the meaning of the ambiguous term

"claimed" in the parties' collective bargaining agreement was "at the very heart of the present dispute" and therefore arbitrable).  Because Article 3 of the CBA incorporates subsequent agreements, such as the Successorship Letter, into the CBA, a dispute over the interpretation of the Successorship Letter is itself arbitrable.  Accordingly, the interpretation of the terms "sale," "merger," and "joint venture" under the Successorship Letter is a question for the arbitrator. Moreover, the correct interpretation of how the "relief clause" in the Successorship Letter applies to the Company's refusal to negotiate over proposed benefit changes is also a dispute "as to the interpretation or application of the terms" of the CBA that is not expressly excluded from the grievance and arbitration procedure.

### 4. The Dispute Over Retiree Medical Benefits Is Subject to Arbitration

Fourth, Grievance R12-6 is also a dispute subject to arbitration under the CBA.  In its letter refusing to arbitrate over retiree health care benefits, the Company stated it had no duty to arbitrate such a grievance "because there is no duty to bargain over such benefits in the first place."  [Doc. No. 20-1, Ex. A-11].  The Company's position is incorrect, however, because health care benefits that bargaining unit employees will receive *after* they retire are a proper subject of bargaining.  *See Allied Chem. and Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 180 (1971) ("To be sure, the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining.").  This issue at least creates an arguable dispute as to whether the Company violated Article 15 of the CBA by refusing to bargain over its changes to the retiree medical plan that affect current employees.  Article 15's guarantee that the benefit plans "shall be continued for the period of this Agreement" is implicated in the Company's change to

14

discontinue certain retiree medical benefits for future retirees, which is an issue for the arbitrator to address.

It does not appear the Company's proposed changes to the retiree medical plan affect current retirees.[2]   However, to the extent the Company's changes affect current retirees, the parties still are required to arbitrate over whether such retiree benefits are guaranteed under the CBA.  *See Exelon Generation Co., LLC v. Local 15, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 540 F.3d 640, 645-47 (7th Cir. 2008) (holding a grievance regarding retiree health care benefits was arbitrable, where the collective bargaining agreement created a right to retiree health care benefits and did not limit arbitrable grievances to those involving current employees); *Cleveland Elec. Illuminating Co. v. Utility Workers Union of Am., Local 270*, 440 F.3d 809, 816 (6th Cir. 2006) ("We find that the presumption of arbitrability applies to disputes over retirees' benefits if the parties have contracted for such benefits in their collective bargaining agreement and if there is nothing in the agreement that specifically excludes the dispute from arbitration.").  Moreover, the Company has stated, "[t]he retiree medical plan is not a separate medical plan, but a part of the Employee Medical Plan" and that under Article 15, the Union explicitly agreed to any modifications the Company made to the retiree medical plan, as long as such changes were generally applicable to all Company employees.  [Doc. No. 20-1, Exs. A-6, A-8].  This disputed position also concerns the interpretation of the CBA, which is properly submitted to an arbitrator.

Finally, for the reasons discussed above, the applicability of the Successorship Letter to Grievance R12-6 is also a question of interpretation of the CBA that must be submitted to the arbitrator.

\*\*\*

---

[2] The Company's changes to the age requirements for the Retiree Medical Plan affect only (1) employees who have not reached the age of 45 as of December 31, 2012, and (2) new employees joining Phillips 66 on or after January 1, 2013.  [Doc. No. 20-1, Ex. A-2].

The Court's role is to determine whether the Grievances fall within the scope of the arbitration clause.   In light of the presumption of arbitrability, the Court cannot say with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T*, 475 U.S. at 650.  Because doubts are resolved in favor of coverage, the Court finds Grievances R12-5 and R12-6 must go to the arbitrator.[3]

### C.        ERISA Does Not Preclude Arbitration of the Grievances

The Company separately argues that this suit must be brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*  This argument also fails. This action is a classic suit to compel arbitration under a collective bargaining agreement governed by Section 301 of the Labor Management Relations Act ("LMRA"), and ERISA explicitly states it does not preempt other federal laws.  29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.").   In support of its position that ERISA governs this dispute, the Company cites *United Steelworkers of America, AFL-CIO, CLC v. United Eng'g, Inc.*, 52 F.3d 1386, 1394 (6th Cir. 1995), which held that suits under Section 301 of the LMRA to recover nonguaranteed pension benefits from employers are precluded by ERISA.  However, the Sixth Circuit later limited *United Engineering* to its narrow holding, recognizing that "[c]laims involving rights created by collective bargaining agreement are governed by the Labor Management Relations Act and are not superseded by ERISA."  *Local*

---

[3] The Court agrees with the Company that Article 1 does not provide an independent basis for an arbitrable grievance here, as the Tenth Circuit has previously ruled Article 1 "does not require . . . that any particular topic be subject to collective bargaining."  *United Steel, Paper and Forestry, Rubber, Mfg., Energy Allied Indus. and Serv. Workers Int'l Union and its Local 13-857 v. ConocoPhillips Co.*, 420 F. App'x 827, 833 (10th Cir. 2011).  Because the Court finds the Grievances to be arbitrable on other grounds, however, a lengthier analysis of Article 1 is not necessary to the Court's holding.

*No. 1654, Int'l Bhd. Of Elec. Workers, AFL-CIO v. L.G. Philips Display Components Co.*, 137 F. App'x 776, 778 (6th Cir. 2005).  Therefore ERISA does not preempt the Union's action here.

**CONCLUSION**

For the reasons outlined above, the Court concludes that Plaintiffs' claim prevails as a matter of law.   Accordingly, Plaintiffs' Motion for Summary Judgment [Doc. No. 21] is **GRANTED** and Defendant's Motion for Summary Judgment [Doc. No. 20] is **DENIED**.   The parties shall submit Grievance R12-5 and Grievance R12-6 to arbitration in accordance with Article 30 of the CBA.

James H. Payne
United States District Judge
Northern District of Oklahoma